NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-978

CARE AND PROTECTION OF FRANCIE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

In November 2017, the Department of Children and Families (department) filed a petition alleging that nine year old Francie was in need of care and protection. At a trial four years later, the department sought to terminate the parental rights of the mother but not the father, who had been deported to Brazil when Francie was two years old. A Juvenile Court judge found the mother unfit and terminated her parental rights, found the father currently fit, and further concluded that it was in Francie's best interests to be reunified with the father. Accordingly, he granted permanent custody of Francie to the father, and Francie moved to Brazil in February 2022.[2] Francie's

---

[1] A pseudonym.

[2] In November 2021, Francie filed a motion in the trial court and a petition in this court, both seeking a stay of the reunification order, and both of which were denied.

appeal concerns only the judgment awarding permanent custody to the father.[3]

On appeal, Francie challenges certain findings as clearly erroneous, including the finding that the department failed to use reasonable efforts to reunify her with her father; claims that the judge improperly disregarded the testimony of her expert witness; and argues that the evidence does not support the judge's conclusion that the father is fit to parent her. We affirm.

1. _Erroneous findings_. a. _The father's compliance_. The department gave the father an action plan with seven tasks.[4] Seeing "no evidence" that he "failed to follow through with services," the judge found that the father did everything the department asked of him. Francie claims this was clearly

---

[3] The mother filed but did not perfect an appeal from the decree terminating her parental rights. The child did not appeal from the decree terminating the mother's rights.

[4] The action plan required the father to (1) cooperate with the international home study; (2) "cooperate with any other recommendations by the Department and other professionals"; (3) "provide the Department with confirmation/verification of recommended services"; (4) visit with Francie via "phone calls/video chat"; (5) "meet with a therapist to support Father with parenting and the potential transition of [Francie]'s custody to Father as well as family functioning once the transition is complete. Father is also recommended to have a batterer's evaluation from a qualified therapist to assess his need for treatment"; (6) "arrange and provide verification of medical, dental, and therapeutic providers [for Francie] in anticipation of an exchange of custody"; and (7) maintain a violence and substance-free home.

erroneous because there was no written documentation verifying what services would be in place for her in Brazil, and because of the father's failure to get a batterer's evaluation and consistently attend therapy.

"A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (citation omitted).  Adoption of Posy, 94 Mass. App. Ct. 748, 751 (2019).  Here, the judge's findings about services for Francie in Brazil were supported by testimony from a social worker that the father "provided verification of medical, dental, [educational,] and therapeutic providers for [Francie] as required."  That same witness acknowledged that the batterer's evaluation was recommended only because of "an isolated comment" by the mother to the department in 2017, id. at 754, that her arguments with the father "would turn into physical disputes."  The judge did not credit these statements and drew a negative inference from the mother's failure to appear for trial or testify.  See Adoption of Talik, 92 Mass. App. Ct. 367, 371 (2017).  By contrast, he did credit the father's testimony that there was no violence in the parents' relationship, which also was what the mother told the department in June 2010, two months after the relationship ended.  In these

3

circumstances, which included the absence of evidence that the department made "any referrals to specific service providers in [the father's] home country," a finding that the father had "domestic violence issues" would be clearly erroneous.  Adoption of Posy, supra at 754 & n.15.  Particularly where there was no indication of violence in the father's home with his wife, the judge did not err in deciding not to be "unduly influenced" by the mother's "flimsy, unsupported, [and] unreliable statement[]" in 2017.  Custody of Tracy, 31 Mass. App. Ct. 481, 485 n.5 (1991).  The judge did not err in concluding that a batterer's evaluation would "shed little light on [the father's] parental fitness."  Adoption of Leland, 65 Mass. App. Ct. 580, 587 (2006).

The father engaged in therapy, but his therapy was interrupted, first by the provider's maternity leave and then by the COVID-19 pandemic.  Francie recognizes these were factors "beyond Father's control."  His inconsistent attendance therefore did not detract from the judge's findings, especially where the therapy was to help the father with Francie's transition, which had not yet started.[5]

---

[5] We note that the father was prohibited from entering the United States until December 2020 and tried several times thereafter to get a visa but was not successful.  In-person visits were not required by the action plan, however, and the father attended every virtual visit with Francie, even when she chose not to

4

b. Reasonable efforts. The judge found that the department "consistently failed" in its obligation to make reasonable efforts toward Francie's reunification with the father. See G. L. c. 119, § 29C. Francie claims that this conclusion is based on erroneous facts and argues that, to the contrary, the evidence established that the department did make reasonable efforts, but that the lengthy separation between the father and daughter, coupled with a language barrier, was simply too great to overcome. We disagree. The judge's findings that the department failed by (1) ignoring the father as an option early in the case and changing Francie's goal to adoption even though it was "clear for years predating this petition that Father has sought to be a caretaker for this child"; (2) not giving the father a family action plan for nearly one year and then doing nothing to assist him to complete the tasks (e.g., not "assist[ing] in any way [with] efforts Father was making to come to the U.S. to get the child"; (3) not offering language lessons to the child; and (4) not developing a realistic reunification plan or exploring appropriate methods to accomplish that goal, including "not following through with

---

attend. Accordingly, the judge did not abuse his discretion in finding the father in compliance with this task as well.

5

information in regard to assistance with international placements," are amply supported.

The evidence established that the department did not provide the father with an action plan until October or November of 2018, after it had already changed its goal for Francie to adoption.[6] It also did not request the international home study required by that plan until the father filed a motion to compel. The department waited until after the trial started in June 2021 to provide the father with a letter he first requested in December 2020, which he thought would help him obtain a visa to come to the United States to visit Francie. And it never used information it received from the Brazilian Consulate about social workers from other department area offices who had experience transporting children to Brazil. The department knew of a company that could transport Francie to Brazil and check in on her monthly for six months after she arrived in Brazil but did not discuss this option before trial, even internally. Francie was not enrolled in Portuguese classes until two months before trial started -- three and one-half years after the

---

[6] The judge found that the plan was given to the father in October; the department social worker testified that he "believe[d]" he produced it in November. The plan itself was not in evidence. To the extent there is error in this unchallenged finding, it does not leave us with a definite and firm conviction that a mistake was committed. Adoption of Posy, 94 Mass. App. Ct. at 751.

petition was filed -- then after two classes the department allowed Francie to drop out because she "did not like it." Finally, the department did not draft a transition plan for Francie until it was ordered to do so on the second day of trial in July 2021, even though reunification with the father had been the department's goal for Francie since November 2020. Francie does not challenge the judge's findings that the plan finally submitted by the department was "superficial" and "skeletal."

The judge's "specific and detailed" findings about the father's compliance with his action plan tasks and the department's efforts are thus supported by the evidence and not clearly erroneous. Adoption of Don, 435 Mass. 158, 165 (2001). Francie "simply views the evidence differently from how the judge viewed it." Adoption of Lisette, 93 Mass. App. Ct. 284, 295 (2018). On appeal, Francie asks us to adopt her view of the evidence, but we may not. See id. at 292. We do not sit as triers of fact. See Adoption of Don, supra at 166-167.

2. Expert witness. An expert witness interviewed Francie when she was ten years old and met with her again a few weeks before trial, when Francie was thirteen. The expert testified, and the judge found, "that [Francie] is an exceptional young woman who is adaptable and able to advocate for herself in any environment," with "strength and ability to persevere despite her trauma." The judge rejected the expert's opinion that

7

reuniting Francie with her father would be harmful to her, however, reasoning that the opinion and the facts "do not coincide" because Francie's "testimony and demeanor did not reflect the inability to transition to Father." Francie claims this was error, but it was not. The judge was not required to accept the expert's opinion. See Adoption of Bea, 97 Mass. App. Ct. 416, 429 (2020). His reasons for not doing so were neither arbitrary nor an abuse of discretion. See Adoption of Don, 435 Mass. at 166-167.

3. Fitness and best interests. Francie argues that the record does not support the judge's determination that the father was fit to parent her. Parental fitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "The parental unfitness test and the best interests of the child test are not mutually exclusive, but rather reflect different degrees of emphasis on the same factors," with the child's welfare being "the most important consideration." Adoption of Lisette, 93 Mass. App. Ct. at 293. The question "is not whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to

8

the child." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). See Bezio v. Patenaude, 381 Mass. 563, 579 (1980) ("A finding that a parent is unfit . . . must be predicated upon parental behavior which adversely affects the child"). While "[o]ne who is fit to parent in some circumstances may not be fit if the circumstances are otherwise" because "[a] parent may be fit to raise one child but not another," Guardianship of Estelle, 70 Mass. App. Ct. 575, 581 (2007), as to each child, "our law only recognizes two possibilities: in given circumstances, a parent is either fit or unfit." Id. at 579. "Custody of a child belongs to a parent unless that parent is unfit." Id. at 578, and cases cited.

It is the department's burden to prove current unfitness by clear and convincing evidence. See Care & Protection of Erin, 443 Mass. 567, 570 (2005). We review the judge's determination "not to decide whether we, presented with the same facts, would have made the same decision, but . . . whether the trial judge abused his discretion or committed a clear error of law." Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied, 526 U.S. 1034 (1999).

Francie is a "good kid" who was pleasant, helpful, and unselfish. She achieved all her developmental milestones, was in good physical health, and had no specialized educational needs. Given her trauma from "significant exposure" to the

9

mother's substance use and unstable lifestyle, however, and "due to the transition of leaving her foster home and moving to a new country," Francie "will have very specialized [emotional] needs" requiring "stability, support, and connection to things that are familiar."[7]

Throughout the case, the father maintained a safe and stable home environment and demonstrated love and a "desire to have [Francie] come live with him."  A study of the father and his home in Brazil was approved in November 2019 and "did not give any indication that Father and his family were unfit to receive [Francie]."  In particular, "Father [did] not have a violent or unsafe home," and "[t]here [wa]s nothing to indicate Father use[d] or abuse[d] illicit substances."  Rather, the

---

[7] In September and October 2017, the department investigated three 51A reports and supported allegations of abuse and neglect.  See G. L. c. 119, §§ 51A, 51B.  The mother agreed to give temporary custody of Francie and her half-siblings to a relative, but that relative became unwilling to be a placement and the children returned to the mother.  The father of the half-siblings then petitioned a court for and was awarded custody of his children.  The mother "informed [the department] that [Francie] would remain with her."  Less than one month later, the mother and Francie were dropped off at a hospital emergency room.  The mother "wanted treatment [for her substance use disorder] but stated that she didn't have anyone to care for [Francie]," so the department filed the petition and took emergency custody, placing Francie in a foster home where she stayed for the next four years.  In those years, Francie had "a series of different therapists," social workers, and teachers.  In 2020, the foster family announced it could not provide permanency.

father lived "in a happy and healthy home with his family" that included his wife and Francie's half-sister, with extended family nearby.[8]  It was the same home the father had lived in since the inception of the case.  He also maintained the same job and had a steady income and health insurance.  Recognizing that reunification would "be a significant and likely difficult change for [Francie]," and "want[ing] to do everything he can to make sure she is emotionally stable through the transition," the father made appropriate arrangements with bilingual providers for Francie to receive private schooling and language classes, medical and dental care, and therapy; took English classes to better communicate with Francie; requested family therapy early in the case to prepare Francie for the transition; and engaged in therapy himself to work on issues related to his conflict with Francie's mother and the child's transition to his care. "[T]here were no other parties identified in a similar position" to provide a "supportive, nurturing home setting built around [Francie's] care."  "The Department failed to produce, or even argue any evidence of Father's unfitness except that he was living in Brazil."

---

[8] The judge found that the father's wife "has spoken to [Francie] several times and loves her."  Though he did not make a finding about what language they spoke, there was evidence that the wife spoke English.

11

Francie testified at the trial and "reflected the ongoing trauma of the tumultuous childhood," the judge found, by suggesting that part of her reason for not wanting to leave the United States was the lack of "closure with her feelings toward Mother abandoning her years earlier." Francie "expressed reservations about going to Brazil," but "[t]he Court did not find the child to be as opposed to the move as had been expressed" by the child's counsel and expert witness. The judge recognized that Francie "no longer ha[d] the bond that she may have once had with Father" and had some concerns about Francie's "particular needs once she is reunified with Father and living in a different country"; however, the judge ultimately concluded that Francie "deserves a loving, supportive, and consistent parent, and the evidence shows that Father is exactly that." The judge determined that the father was "prepared to meet all of [Francie]'s educational, medical, and emotional needs," therefore, the department "failed to present sufficient evidence to establish that Father has grievous shortcomings or handicaps that would put this child at risk," and failed to show "by clear and convincing evidence that the Father is unfit." Reasoning that the father "has a right to custody of his child," which also "serves the best interests of the subject child," the judge ordered reunification.

12

Francie claims this was error because, despite engaging in services and visiting with Francie, the father did not "evidence the insight that would allow him to parent a teenager who was not bonded to him" and who had "complex emotional functioning." Francie also asserts that the judge (1) "ignored crucial unchallenged evidence" showing the father did not prioritize Francie's needs over his own, and (2) made up his mind without hearing all the evidence, as reflected by his comments about the father's commitment to Francie and that "we're sort of just going through an exercise here" because there was "no real dispute as to" the father's fitness.  Finally, Francie alleges that the judge acted "with little regard for her well-being" by ignoring her wishes and acting as if Francie's "best interests were secondary to [the department]'s supposed failures (and Father's rights)."  Although this case presents a number of concerns, we are not persuaded that the judge made a clear error of judgment in weighing the factors relevant to the decision, such that his decision fell outside the range of reasonable alternatives.  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The father demonstrated growth from his therapy and an understanding of Francie's emotional needs when he testified to Francie's devastation by the loss of contact with her mother and his support of the mother's recovery and Francie regaining

13

contact with her.  In addition, before trial, he agreed during a visit where Francie asked about his deportation to wait for Francie's therapist to be present before he answered because he knew the conversation would be emotional.  The father also asked a social worker for help telling Francie about his wife's pregnancy in a way that would help Francie feel supported because he worried she "might have a difficult time with this information."  Finally, the father identified a bilingual therapist for the child, and planned to have her continue therapy once in Brazil, because he "appreciates the challenges that [Francie] is going to have . . . adjusting to the new culture and family."  Francie's assertion that the father failed to demonstrate growth in his understanding of and ability to meet Francie's needs is grounded in the father's supposed refusal to accept that Francie did not want to move to Brazil, and is belied by the judge's findings.  The judge credited the father's testimony that he "totally understand[s]" Francie's fear of "leaving everything behind that she knows of and moving to a different place."

In sum, "there was adequate evidence to support" the judge's view that the father understood and was prepared to meet Francie's particular needs, Adoption of Quentin, 424 Mass. 882, 887 (1997), making him "fit to parent this child in these circumstances at this time."  Guardianship of Estelle, 70 Mass.

14

App. Ct. at 582. Francie's disagreement with the father's decision to seek reunification in Brazil rather than allow Francie to stay in the United States is understandable, but her disagreement does not create parental unfitness.

We are not persuaded that the judge's comments, in context, show that he prejudged the case. While he did express a favorable view of the father's efforts to maintain a relationship with Francie after he was deported, the judge also said, "I don't know that he's perfect," and denied the father's request for a decision without hearing from Francie's expert. Nor do we believe the judge acted without regard to Francie's wishes or well-being. To the contrary, the judge had "deep appreciation for the wishes of the child," characterizing her "discontent in moving to a new country" as "very real."

The judge obviously understood that "the fitness of parents and the best interests of the child are related," Custody of a Minor, 389 Mass. 755, 766 (1983), with "the balance to be struck . . . more complex in nature" than simply doing what one or the other wants, Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 376 Mass. 252, 266 (1978), because he recited that "[t]he specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness." He also considered that "the question is what's

15

different?  Why is [the child] going to struggle if she's -- if she ultimately is sent back to live with her dad.  Why -- you know, what makes her different than another kid."  These comments reflect an appropriate focus on the father's fitness as a function of "the various factors unique to" Francie, Custody of a Minor, 375 Mass. 733, 753 (1978), rather than on the father's fitness "in the abstract," Guardianship of Estelle, 70 Mass. App. Ct. at 579, or on the department's failures.

Francie points out that the judge's frustration with the department was indeed "palpable."  In some circumstances such frustration might create a risk that the "judge's impartiality might reasonably be questioned."  Commonwealth v. Morgan RV Resorts, LLC, 84 Mass. App. Ct. 1, 10 n.16 (2013).  We have carefully reviewed the record, however, and are confident that it did not cloud the decision.[9]  The judge's comments at trial, findings, conclusions, and decision denying Francie's postjudgment motion for a stay demonstrate that, as required, G. L. c. 119, § 29C, his "lodestar" was always Francie's best interests.  Adoption of Bea, 97 Mass. App. Ct. at 426.  See Adoption of Ilona, 459 Mass. 53, 61 (2011) ("even where the

---

[9] We too are concerned by the department's failure to take steps to enable an in-person visit, such as transporting Francie to another country.

16

department has failed to [make reasonable efforts], a trial judge must still rule in the child's best interest").

The negative facts about the father that Francie claims the judge ignored appeared in a record of the department's June 2010 investigation of a 51A report, see G. L. c. 119, §§ 51A, 51B, wherein the father denied that the mother used illicit substances.  Yet, based on the father's testimony at trial, the judge found that the mother "was actively using" illicit substances before, in, and continuing after June 2010.  Francie argues that the father was either lying then and "squandered" the opportunity to help Francie or he is lying now to put himself in a better light.  However, the father's testimony about his actions in 2010 did not put him in a good light.  By his own admissions, when the child was two, the father thought the mother was misusing illicit substances but left the child in her care.  The judge did not condone those actions and neither do we.  Still, "a determination of unfitness must be based on current evidence," Adoption of Ramona, 61 Mass. App. Ct. 260, 264 (2004), as the judge recognized, focusing the parties at trial on the present circumstances.[10]  See Adoption of George, 27 Mass. App. Ct. 265, 268 (1989) (stale information cannot be

_____

[10] For example, the judge said during the trial, "Let's kind of focus on the present," and "obviously the issue is where are we today."

17

basis for finding of current parental unfitness, though prior history can have prognostic value); Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 126 (1984) ("isolated problems in the past or stale information cannot be a basis for a determination of current parental unfitness").

Finally, the judge properly considered the father's rights as part of the analysis, because they were "cognate and connected" with Francie's best interests. Blixt v. Blixt, 437 Mass. 649, 658 (2002). The presumption that parents will act in their child's best interests, id., applies equally to Francie. See G. L. c. 209C, § 1 ("Children born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children"). Since paternity was never in dispute, the father's and Francie's relationship was "a family unit worthy of protection." Petition of New Bedford Child & Family Servs. to Dispense with Consent to Adoption, 385 Mass. 482, 490 (1982). See Smith v. McDonald, 458 Mass. 540, 544 (2010) ("Once paternity is established . . . [a] father, if not unfit, has a constitutionally protected right to parent and maintain a relationship with his child"); G. L. c. 210, § 4A (unwed father entitled to custody if not unfit and

in child's best interest).  The judge did not err in treating it that way.

Judgment affirmed.

By the Court (Vuono, Henry & Grant, JJ.[11]),

*Joseph F. Stanton*

Clerk

Entered:  August 9, 2023.

---

[11] The panelists are listed in order of seniority.